UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KENNETH LITTLES,

                Plaintiff,

           - against -

ROBERT MOLLOY,

                Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
17-CV-4302 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Kenneth Littles, proceeding *pro se*, brought this action under 42 U.S.C. § 1983, claiming that he was falsely arrested by Defendant Robert Molloy. Defendant presently moves for summary judgment, and Plaintiff has not opposed. For the reasons contained herein, the Court grants the motion for summary judgment.

## BACKGROUND

**I.    Factual Background**

      On May 20, 2017, at approximately 8:00 p.m., Plaintiff was with a woman in the vicinity of 75th Street and Jamaica Avenue in Queens, New York. (Defendant's Rule 56.1 Statement[1]

---

[1] For present purposes, given that Defendant's motion for summary judgment is unopposed, a standalone citation to Defendant's Rule 56.1 statement, unless otherwise noted, indicates that the underlying factual allegation is supported by the record, and therefore is accepted as true. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (holding that, even where a motion for summary judgment is unopposed, "the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement," but rather "must be satisfied that the citation to evidence in the record supports the assertion" made by the moving party); *see also Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("[T]o the extent any statements [in a party's Rule 56.1 statement] are supported by the record and not specifically controverted by admissible evidence, they are deemed admitted."). Any citation to Defendant's Rule 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.

("Def.'s 56.1"), Dkt. 71, ¶ 1.) Two men, later identified as Mohammad Uddin and Azahaurl Islam, attempted to catch the attention of the woman with Plaintiff. (*Id.* ¶ 2.) When Plaintiff confronted Islam and Uddin, Islam called 911 and reported that Plaintiff was robbing them.[2] (*Id.* ¶¶ 3–4.) Plaintiff proceeded to walk away, but Uddin and Islam followed in pursuit. (*Id.* ¶¶ 5–6.) Islam remained on the phone with 911 dispatchers—informing the dispatchers, among other things, that the robber was running on Jamaica Avenue and was a black male wearing black pants and a black hoodie. (*Id.* ¶¶ 7–9; *see also* Transcript of 911 Call, Dkt. 70-3, at 3:17–4:14.)

That evening, Defendant Molloy, who is a New York City Police Department ("NYPD") officer, along with two other NYPD officers, was on patrol in plainclothes and in an unmarked police vehicle. (*See* Def.'s 56.1, Dkt. 71, ¶ 11; Trial Testimony of Robert Molloy ("Molloy Test."), Dkt. 70-6, at 119:2–120:22.) At approximately 8:30 p.m., Defendant received a "radio run"[3] regarding a robbery in progress at 75th Street and Jamaica Avenue. (Def.'s 56.1, Dkt. 71, ¶ 12; *see also* Suppression Hearing Transcript ("Hr'g Tr."), Dkt. 70-5, at 5:25–6:8.) The radio dispatch notified Defendant that the suspected robber was a black male wearing black jeans and a black hoodie. (Def.'s 56.1, Dkt. 71, ¶ 13.) Upon arriving at 75th Street and Jamaica Avenue, Defendant did not see anyone, but at that point, a second radio communication came through saying that the complainants who had reported the robbery were chasing the fleeing suspect and were in the vicinity of Lincoln Avenue and Jamaica Avenue. (*See id.* ¶¶ 14–16; Hr'g Tr., Dkt. 70-

---

[2] Defendant bases this portion of the account on Plaintiff's deposition testimony and purported statement to Defendant after Defendant and other officers responded to the 911 call. (*See* Deposition of Kenneth Littles ("Littles Dep."), Dkt. 70-1, at 28:25–32:4, 40:5–16.)

[3] A "radio run" is "when someone calls 911" and the information "gets dispatched over [the officers'] radio." (Molloy Test., Dkt. 70-6, at 121:2–3); *see also Thompson v. Clark*, No.14-CV-7349 (JBW), 2018 WL 3128975, at *15 (E.D.N.Y. June 26, 2018) ("The 'radio run' is a description of the 911 call given from a dispatcher, not the 911 call, or a transcript of the call itself.").

2

5, at 6:24–7:5.) Defendant and his partners proceeded to that location in their patrol car with their lights and sirens on. (Hr'g Tr., Dkt. 70-5, at 7:6–8:3.) As they arrived, Defendant saw two men—Uddin and Islam—jumping up and down and yelling, trying to gain the officers' attention. (Def.'s 56.1, Dkt. 71, ¶ 18; *see also* Molloy Test., Dkt. 70-6, 123:5–9.) Uddin and Islam indicated that the suspected robber was in the back of a taxicab, which belonged to a third party and was parked on the side of the road; the two men were yelling something to the effect of "we got him, he is in here" and pointing to the parked cab. (Hr'g Tr., Dkt. 70-5, at 8:3–17.) Defendant approached the taxicab and saw a black man, later identified as Plaintiff, wearing a black hoodie and black jeans in the back of the vehicle. (*Id.* at 10:13–16; *see also* Molloy Test., Dkt. 70-6, at 123:16–124:4.) The driver of the taxicab opened the door of the cab, and Defendant removed Plaintiff from the vehicle, placed him in handcuffs for safety reasons, and left him in the custody of another officer about thirty or forty feet away from Uddin and Islam. (Def.'s 56.1, Dkt. 71, ¶¶ 20–22; *see also* Hr'g Tr., Dkt. 70-5, at 13:18–14:6.)

Defendant then questioned Islam and Uddin, who told Defendant that Plaintiff had threatened them with a gun, stolen a cell phone from Uddin, and started running. (Def.'s 56.1, Dkt. 71, ¶ 23; *see also* Hr'g Tr., Dkt. 70-5, at 9:9–17.) Islam and Uddin also informed Defendant that they had chased Plaintiff and apprehended him at one point, and that Plaintiff had escaped by punching one of them in the head; they ultimately recaptured Plaintiff when he jumped into the taxicab and the driver locked the door after observing Islam and Uddin running down the street saying that Plaintiff had robbed them. (Def.'s 56.1, Dkt. 71, ¶ 24; *see also* Hr'g Tr., Dkt. 70-5, at 9:18–25, 19:5–10, 24:7–14.) After speaking with Islam and Uddin, Defendant spoke with Plaintiff to learn his version of the events. (Hr'g Tr., Dkt. 70-5, at 17:13–17.) Plaintiff denied that any robbery had occurred, and instead provided the above account about Uddin and Islam trying to get

his female companion's attention and about Plaintiff confronting them and then walking away. (*See* Littles Dep., Dkt. 70-1, at 40:5–16, 41:19–23.) Defendant also spoke with the woman who had been with Plaintiff, who at this point was standing across the street and denied knowing what was going on. (*See id.* at 41:24–42:10; *see also* Hr'g Tr., Dkt. 70-5, at 17:18–18:1.) Defendant then placed Plaintiff under arrest for robbery.[4] (Def.'s 56.1, Dkt. 71, ¶ 25.)

During the criminal proceedings in state court, Plaintiff moved to suppress all evidence obtained during his arrest as fruits of an unlawful seizure. (*Id.* ¶ 26.) The state court held a suppression hearing. (*See* Hr'g Tr., Dkt. 70-5; *see also* Decision and Order on Omnibus Motion, Dkt. 70-8, at 2 (ordering that a suppression hearing be held prior to trial).) After hearing testimony from Defendant, the state court concluded that "the removal of [Plaintiff] from the taxi cab was certainly reasonable under the circumstances," because Plaintiff matched the description provided by the radio dispatch and had been fleeing, as the second radio dispatch indicated. (Hr'g Tr., Dkt. 70-5, at 24:15–22.) The state court moreover found that "shortly after [Plaintiff] was taken out of [the] vehicle, or almost immediately after he was taken out of [the] vehicle, the complainants flushed out the story and explained to the officers what had happened." (*Id.* at 24:23–25:1.) The state court accordingly decided that "the apprehension of [Plaintiff] was reasonable and proper under the circumstances," and denied Plaintiff's suppression motion. (*Id.* at 25:2–14.) Following a jury trial in October 2017, the jury acquitted Plaintiff of all charges. (Def.'s 56.1, Dkt. 71, ¶ 30.)

---

[4] Defendant also spoke with the taxicab driver. It is not entirely clear when that conversation happened, although Defendant's testimony at the suppression hearing indicates that Defendant spoke with the driver after placing Plaintiff under arrest. (*See* Hr'g Tr., Dkt. 70-5, at 17:5–12.) In any event, the Court has not considered any information that Defendant may have learned from the taxicab driver in assessing probable cause.

## II.     Procedural History

Plaintiff, proceeding *pro se*, filed a complaint on July 12, 2017, and an amended complaint on July 25, 2017. (Dkts. 1, 6.) The Amended Complaint asserted a claim of false arrest against Defendant Molloy, as well as claims against Uddin and Islam. (*See* Dkt. 6, at 2–4.) On December 7, 2017, upon initial screening of the Amended Complaint, the Court *sua sponte* dismissed the claims against private individuals Uddin and Islam, but allowed the false arrest claim against Defendant Molloy to proceed. (Dkt. 8, at 3.)

On March 11, 2020, following discovery, Defendant requested a pre-motion conference regarding an anticipated motion for summary judgment. (Dkt. 61.) The Court determined that a pre-motion conference was unnecessary and set a briefing schedule for the motion. (4/8/2020 Docket Order.) On June 29, 2020, Defendant filed a letter informing the Court that while Defendant had timely served Plaintiff with moving papers on May 8, 2020, Plaintiff had not submitted an opposition. (Dkt. 66, at 1; *see also* Defendant's Local Rule 56.2 Notice, Dkt. 69.) Additionally, Defendant noted that defense counsel had twice spoken to Plaintiff by telephone about Plaintiff's intention to serve an opposition: the first time, on June 26, 2020, Plaintiff indicated that he needed more time to consider whether to prepare an opposition; the second time, on June 29, 2020, Plaintiff told defense counsel that he needed an additional day to decide whether to oppose. (Dkt. 66, at 1–2.) Defendant filed a follow-up letter on July 1, 2020, stating that defense counsel had attempted to reach Plaintiff by telephone numerous times since June 29, but had been unsuccessful in doing so, and had heard no response from Plaintiff regarding his intention to oppose the summary judgment motion. (Dkt. 67, at 1.) On July 7, 2020, the Court *sua sponte* extended the deadline for Plaintiff to file an opposition to August 6, 2020. (7/7/2020 Docket Order, which the Court mailed to Plaintiff on July 7, 2020.) On August 19, 2020, with no response from

Plaintiff, the Court deemed Defendant's motion for summary judgment to be unopposed. (8/19/2020 Docket Order.)

Defendant argues that summary judgment on Plaintiff's false arrest claim is proper because: (1) there was probable cause to arrest Plaintiff; (2) there was reasonable suspicion to detain Plaintiff initially and handcuff him; and (3) in any event, Plaintiff is collaterally estopped from re-litigating the reasonableness of his detention because of the state court's decision on his suppression motion. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem."), Dkt. 72, at 5–13.)

## DISCUSSION

### I.  Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if the record evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248, 255. Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citation omitted).

The moving party bears the initial burden of "establishing the absence of any genuine issue of material fact." *Zalaski v. Cty. of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once this initial burden is met, "[t]he nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Even where a motion for summary judgment is unopposed, the court must still "examin[e] the moving party's submission to determine if [the moving party] has met its burden of demonstrating that no material issue of fact remains for trial," and that it "is entitled to judgment as a matter of law." *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citations and internal quotations omitted); *see also Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) ("[S]ummary judgment only is appropriate when the moving party has met its burden of production . . . to show initially the absence of a genuine issue concerning any material fact." (internal quotation marks and citations omitted)).

## II.  Collateral Estoppel

The Court begins by quickly dispensing with Defendant's argument of collateral estoppel (sometimes referred to as issue preclusion). "Under 28 U.S.C. § 1738 a federal court must, in according full faith and credit, give to a State court judgment the same preclusive effect as would be given to the judgment under the law of the State in which the judgment was rendered." *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996) (citation omitted). In New York, "the doctrine of collateral estoppel, or issue preclusion, 'bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest the prior determination.'" *Id.* (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 976 (1994)). As this definition indicates, collateral estoppel has "two essential elements": (1) "the identical issue necessarily must have been decided in the prior action and be decisive of the present action"; and (2) "the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (quoting *Juan C. v. Cortines*, 89 N.Y.2d 659, 667

7

(1997)); *accord McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007) (quoting *Vargas v. City of New York*, 377 F.3d 200, 205–06 (2d Cir. 2004)).

It is well-established that under New York law, "[i]f a party has not had the opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue." *Jenkins*, 478 F.3d at 91 (quoting *Johnson*, 101 F.3d at 795); *see also People v. Medina*, 617 N.Y.S.2d 491, 493 (App. Div. 1994) ("The People did not have a full and fair opportunity to litigate the suppression order . . . because they had no opportunity to appeal the erroneous decision."). Indeed, "New York courts have held that facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges," given "the defendant's lack of an opportunity to obtain review of an issue decided against him." *Johnson*, 101 F.3d at 795–96 (collecting cases); *see also Jenkins*, 478 F.3d at 92 (quoting *Johnson*, 101 F.3d at 795–96). Here, Plaintiff was acquitted of all charges and had no reason to file an appeal. (Def.'s 56.1, Dkt. 71, ¶ 30.) He accordingly lacked a full and fair opportunity to contest the state court's decision on his suppression motion, and collateral estoppel does not apply with respect to any of the issues determined in that decision. *See Jenkins*, 478 F.3d at 92; *Johnson*, 101 F.3d at 795–96.

Therefore, the Court proceeds to the merits of the false arrest claim at issue.

### III. False Arrest

"A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (ellipsis omitted) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Jenkins*, 478 F.3d at 84 (quoting *Weyant*, 101 F.3d at 852). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a

8

person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008)). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (alterations, internal quotation marks, and citations omitted).

Defendant in this case, moreover, invokes the defense of qualified immunity. (Def.'s Mem., Dkt. 72, at 8 n.2; *see also id.* at 9 n.4.) In the false arrest context, qualified immunity shields an arresting officer from a claim for damages as long as the officer "can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause "exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (per curiam) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007)); *see also Daniel v. Orlando*, No. 16-CV-1418 (PKC) (RLM), 2019 WL 1791517, at *5 (E.D.N.Y. Apr. 24, 2019) ("Arguable probable cause exists where 'officers of reasonable competence could disagree on the legality of [their] action [in this] particular factual context.'" (alterations in original) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007))).[5]

---

[5] The qualified immunity analysis in general "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 n.3 (2d Cir. 2021) (quoting *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014)). Qualified immunity attaches if either question is answered in the negative, *i.e.*, in favor of the defendant, and there is no rigid order in which a court must address the questions. *Id.*; *see also Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). Examining both prongs of the qualified immunity analysis "is often beneficial," *Pearson*, 555 U.S. at 236, but "it has become the virtual default practice of federal courts considering a qualified immunity defense

The undisputed material facts here show that Defendant had at least arguable probable cause to arrest Plaintiff for robbery after speaking with Uddin and Islam. "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Panetta*, 460 F.3d at 395 (internal quotation marks and citations omitted); *accord Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted). The putative victims in this case, Uddin and Islam, undisputedly informed Defendant that Plaintiff had threatened them with a gun and stolen a cell phone from Uddin. (Def.'s 56.1, Dkt. 71, ¶ 23.) The two also told Defendant that they had chased and caught Plaintiff at one point, and that Plaintiff had escaped by punching one of them in the head, before jumping into the taxicab and being apprehended. (*Id.* ¶ 24; *see also* Hr'g Tr., Dkt. 70-5, at 9:18–25, 19:5–10.) Under New York law, a person is guilty of robbery in the third degree if the person "forcibly steals property." N.Y. Penal Law § 160.05. If the person "forcibly steals property" and, "[i]n the course of the commission of the crime or of immediate flight therefrom, . . . [c]auses physical injury to any person who is not a participant in the crime[,]" the person is guilty of robbery in the second degree. N.Y. Penal Law § 160.10(2)(a). Therefore, based on the information that Uddin and Islam provided, a reasonable

---

to assume the constitutional violation in the first question and resolve a case on the clearly established prong," *Hurd*, 984 F.3d at 1084 n.3. Considering the circumstances of this case, including the unopposed nature of Defendant's motion, the Court finds no benefit in departing from the "virtual default practice," and it decides Defendant's motion simply on the clearly established prong of the qualified immunity analysis. Therefore, the Court asks whether "a reasonable police officer in the same circumstances and possessing the same knowledge as [Defendant] *could* have reasonably believed that probable cause existed in the light of well established law." *See Droz*, 580 F.3d at 109 (quoting *Zellner*, 494 F.3d at 369); *see also Hurd*, 984 F.3d at 1089 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009))).

officer could have reasonably believed that probable cause existed to arrest Plaintiff. That Plaintiff denied committing the robbery is, by itself, immaterial in this case. "The Second Circuit has held consistently that conflicting accounts of a crime do not vitiate the probable cause established by an eyewitness identification or alleged victim of a crime." *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 205 (E.D.N.Y. 2014) (collecting cases); *see also Daniel*, 2019 WL 1791517, at *6 ("[A] police officer need not investigate all potentially exculpatory claims prior to making an arrest. To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" (quoting *Mazza v. City of New York*, No. 98-CV-2343 (ILG), 1999 WL 1289623, at *5 (E.D.N.Y. July 13, 1999))). Accordingly, given the information Defendant received from Uddin and Islam and having no apparent reason to doubt the veracity of that information, Defendant had at least arguable probable cause to arrest Plaintiff for robbery.

By the time Defendant questioned Uddin and Islam, however, Plaintiff had already been removed from the back of the parked taxicab, placed in handcuffs for safety, and left in the custody of another officer thirty or forty feet away from Uddin and Islam. (*See* Def.'s 56.1, Dkt. 71, ¶¶ 20–22.) Defendant assumes that these circumstances amount merely to an investigatory detention, or a *Terry* stop, requiring only reasonable suspicion—not an arrest requiring probable cause. (*See* Def.'s Mem., Dkt. 72, at 8–9); *cf. United States v Compton*, 830 F.3d 55, 61 (2d Cir. 2016) ("Under the Fourth Amendment, an officer may conduct a brief investigatory detention (commonly known as a '*Terry* stop') as long as the officer has reasonable suspicion 'that the person to be detained is committing or has committed a criminal offense.'" (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014))). This assumption merits some attention.

"Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017); *see also United States*

11

*v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest." (collecting cases)).  At the same time, "where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest."  *Newton*, 369 F.3d at 674 (ellipsis in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)); *see also Grice*, 873 F.3d at 167 ("[A] police officer, 'faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists.'" (quoting *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990))).

Here, it is not disputed that there were safety concerns at the time Defendant placed Plaintiff in handcuffs.  (*See* Def.'s 56.1, Dkt. 71, ¶ 20.)  Indeed, the two radio runs that Defendant had received indicated a robbery in progress and a fleeing suspect who was being pursued.  (*See id.* ¶¶ 12, 16; *see also* Hr'g Tr., Dkt. 70-5, at 5:25–7:5.)  Given these circumstances, it was not unreasonable for Defendant to have handcuffed Plaintiff while investigating further and questioning the putative victims.  *See United States v. Fiseku*, 915 F.3d 863, 873–74 (finding no Fourth Amendment violation where officer handcuffed suspects during an investigatory stop in which "[t]he likelihood of ongoing or imminent criminal activity heightened the risk that one or more suspects might be armed and that they might attempt to flee or flee"); *Ikezi v. City of New York*, No. 14-CV-5905 (MKB), 2017 WL 1233841, at *8 (E.D.N.Y. Mar. 31, 2017) (concluding that officers did not act unreasonably in handcuffing suspects while investigating non-violent crime of possession of "forged or fictitious" license plates, where officers were concerned about plaintiffs possibly fleeing); *see also Bailey*, 743 F.3d at 340 (observing that the Fourth Amendment "do[es] not foreclose the possibility that . . . the government may be able to point to circumstances

12

supporting a reasonable basis to think that even an unarmed person poses a present physical threat or flight risk warranting handcuffing"). Thus, the use of handcuffs under the particular and undisputed circumstances of this case did not exceed the bounds of a *Terry* stop.

Additionally, a reasonable officer in Defendant's position could have reasonably believed that there was reasonable suspicion to detain Plaintiff. Reasonable suspicion is more substantial than an "inarticulate hunch." *Compton*, 830 F.3d at 61 (alteration omitted) (quoting *Terry*, 392 U.S. at 22). Indeed, it "must derive from 'specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing.'" *Id.* (quoting *Bailey*, 743 F.3d at 332). This standard, though is "not high," and certainly "is less demanding than probable cause." *United States v. Singletary*, 798 F.3d 55, 59–60 (2d Cir. 2015) (internal quotation marks and citations omitted). Here, at the point Plaintiff was detained, Defendant had undisputedly (1) received a radio run informing him of a robbery in progress allegedly perpetrated by a black male wearing black pants and a black hoodie; (2) received a second radio run informing him that the suspected robber was being pursued in the vicinity of Lincoln Avenue and Jamaica Avenue; (3) arrived at that location to find the putative victims jumping up and down to get his attention, and pointing to the back of a parked taxicab and yelling something along the lines of "we got him, he is in here"; and (4) found a person in the cab matching the description of the suspected robber. (*See* Def.'s 56.1, Dkt. 71, ¶¶ 12–19; *see also* Hr'g Tr., Dkt. 70-5, at 5:25–8:17, 10:13–16; Molloy Test., Dkt. 70-6, at 120:23–124:4.) Under these circumstances, a reasonable officer could have reasonably believed that there existed "specific and articulable facts" that provided "a particularized and objective basis for suspecting wrongdoing." *See Compton*, 830 F.3d at 61 (quoting *Bailey*, 743 F.3d at 332); *see also Gil v. County of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) (determining that summary judgment

was appropriate on false arrest claims because "[e]ven if the arresting officers were somehow mistaken as to their beliefs regarding reasonable suspicion to stop and detain or regarding probable cause to arrest, it was certainly reasonable for them to believe that reasonable suspicion existed to stop and detain and that probable cause existed to arrest").

In sum, Defendant is entitled to summary judgment as to Plaintiff's claim of false arrest based on qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendant's unopposed motion for summary judgment is granted on the basis of qualified immunity. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal of this Memorandum and Order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2021
       Brooklyn, New York